## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**RONALD MEALEY**

       **Plaintiff,**

    **v.**

**BALTIMORE CITY POLICE
DEPARTMENT,** *et al.*

      **Defendants.**

**Civil No. 1:21-cv-02332-JRR**

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendants Baltimore Police Department ("BPD") and Major John Webb's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 40; the "BPD Motion.")  The court also has before it Sergeant Kurt Roepcke's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 41; the "Roepcke Motion.")  The parties' submissions have been reviewed and no hearing is necessary.  Local Rule 105.6 (D. Md. 2021).

## BACKGROUND[1]

Plaintiff Ronald Mealey brought this action against Defendants BPD, Webb, and Roepcke alleging he was subject to retaliation in violation of 42 U.S.C. § 1983 and Maryland's Declaration of Rights, Article 40, for exercising his right to free speech.  (ECF No. 39; First Amended Complaint, referred to as "Amended Complaint.")  Plaintiff is currently employed by BPD as the Bomb Squad Commander.  *Id.* ¶ 10.  Roepcke is currently employed by BPD as the Administrative Sergeant for BPD Bomb Squad.  *Id.* ¶ 4.  Webb is currently employed by BPD as the commanding officer of the Special Operations Section.  *Id.* ¶ 5.

---

[1] For purposes of this memorandum, the court accepts as true the well-pled facts set forth in the Amended Complaint.

In February 2019, Plaintiff met with Deputy Inspector General Gerald D'Angelo as part of the Baltimore City Office of Inspector General's ("OIG") investigation into fraud, waste, and abuse by Roepcke and BPD's Marine Unit and Underwater Recovery/Dive Team during the removal of a sunken vessel in the Inner Harbor known as the "Danger Zone." (ECF No. 39 ¶ 11.) As part of the investigation, Plaintiff provided substantive information detailing Roepcke's waste of taxpayer funds, breaches of BPD policies, and fraudulent procurement of an underwater saw. *Id.* Specifically, Plaintiff told OIG investigators that Roepcke asked to use a detonation cord in the Danger Zone, despite not being qualified to do so. *Id.* ¶ 13.

Following issuance of the OIG report in July 2019, BPD Commissioner Harrison referred the matter to the Public Integrity Bureau ("PIB") for appropriate disciplinary action; however, no disciplinary action was taken and PIB cleared Roepcke of wrongdoing. *Id.* ¶ 14. After issuance of the report, Roepcke became aware that Plaintiff had given multiple statements to the OIG. (ECF No. 39 ¶ 15.) Roepcke informed Webb of the statements Plaintiff gave to the OIG during the investigation into the Danger Zone incident. *Id.* Subsequently, in retaliation for Plaintiff's participation in the OIG investigation, Roepcke filed two complaints against him. *Id.* ¶¶ 16, 17. In both cases, the charges were determined to be unfounded. *Id.* ¶ 17.

In June 2020, the Baltimore City Council voted to defund the BPD Marine Unit, and Roepcke was left without an assignment. (ECF No. 39 ¶ 18.) On July 5, 2020, in contravention of BPD policy, Roepcke was named Administrative Sergeant of the Bomb Squad despite lacking Bomb Technician credentials. *Id.* ¶¶ 19, 20. Once Roepcke was in this position, he pursued application to attend the FBI's Hazardous Devices School ("HDS"). *Id.* ¶ 22. To do so, he needed to be nominated by a BPD HDS graduate and Plaintiff had to sign his application as the Bomb Squad Commander. *Id.* On July 21, 2020, Plaintiff emailed his chain of command, Lt. Klein,

regarding his concerns that Roepcke was unsuitable for the HDS.  (ECF No. 39 ¶ 23.)  Lt. Klein ignored Plaintiff's protestations and instructed him to go forward with Roepcke's application.  *Id.* Still concerned, Plaintiff voiced to Webb his belief that Roepcke was not a suitable candidate for the HDS, but Plaintiff signed the application under Webb's threat of demotion should he fail to do so.  *Id.* ¶ 24.

Subsequently, because he viewed the matter as one of public concern, Plaintiff contacted the FBI coordinator.  *Id.* ¶ 25.  The FBI coordinator instructed Plaintiff to document his concerns by letter to Sergeant John Adamek at the National Bomb Squad Commanders Advisory Board.  *Id.* On September 2, 2020, Roepcke received a letter from the FBI terminating his HDS application pursuant to the National Guidelines for Bomb Technicians.  *Id.* ¶ 30.

Thereafter, Roepcke filed departmental charges and complaint reports against Plaintiff. (ECF No. 39 ¶¶ 33, 39, 46.)  In response, Plaintiff reported to Webb that Roepcke was retaliating against him.  *Id.* ¶¶ 31, 35, 43.  On October 19, 2020, Roepcke, or someone acting on his behalf, cut the lock to a secured room containing Plaintiff's colt service rifle.  *Id.* ¶ 36.  Roepcke, or his delegate, took the service rifle and left it unsecured in the office in an attempt to have Plaintiff charged.  *Id.*  On February 15, 2021, Plaintiff was electrocuted by contact with a con-ex box in the area previously utilized by the Marine Unit.  *Id.* ¶ 44.  Plaintiff learned that at the direction of Roepcke, Officer Brian Wassum had improperly wired the box.  *Id.*  In addition, on August 25, 2021, Webb refused to consider Plaintiff as a driver of the command vehicle when a vacancy for the position arose.  *Id.* ¶ 50.  Plaintiff alleges that the refusal to consider him for the driver position was in direct retaliation for Plaintiff's "whistleblowing" activities and his role in rejection of Roepcke's HDS application.  *Id.*

Convinced that Roepcke was retaliating against him, and that Webb and other command staff were not protecting him, Plaintiff reached out to the OIG.  (ECF No. 39 ¶ 57.)  The Deputy Inspector investigating Plaintiff's claims contacted BPD Chief of Staff about the complaints; within one week, BPD advised the Bomb Squad that it was no longer a full-time, stand-alone unit, and that all Bomb Squad officers would be reassigned to the Mobile Metro Unit ("MMU").  *Id.* ¶ 59.  Plaintiff alleges that the changes implemented by BPD were in response to the mounting accusations against Roepcke and to exercise more control over Plaintiff.  *Id.* ¶ 62.[2]

Plaintiff alleges that his participation in the OIG investigation and/or his objections to Roepcke's HDS application were exercises of his First Amendment right to free speech, and that Roepcke's actions toward Plaintiff were retaliatory and violated his First Amendment right to free speech as well as BPD's Whistleblower Protection Policy No. 1792.  *Id.* ¶¶ 63, 64.  Plaintiff further alleges that "BPD, by and through its Command Staff, including but not limited to Major Webb, have violated Officer Mealey's First Amendment Protections and continue to allow Sgt. Roepcke to take improper retaliatory actions."  (ECF No. 39 ¶ 65.)  BPD's anti-retaliation/whistleblower policy imposes on BPD officers a duty to report misconduct and to intervene to prevent or stop misconduct, and strictly prohibits retaliation against, or interference with, a BPD member for any reason, including those who report, or seek to report, violations of law or BPD policy.  *Id.* ¶ 47.[3]  Despite the whistleblower policy, Plaintiff alleges BPD has an "official policy or custom of unfettered retaliation against whistleblowers and/or officers that exercise their First Amendment Rights."  *Id.* ¶ 48.

---

[2] The court notes that the page numbers in the Amended Complaint are not numbered correctly.  This citation is to ¶ 62 on p. 21.

[3] This citation is to ¶ 47 on p. 21.

On February 7, 2022, Plaintiff Mealey filed an Amended Complaint against Defendants BPD, Webb, and Roepcke, which sets forth two counts against all Defendants: (I) First Amendment Retaliation – Freedom of Speech 42 U.S.C. § 1983; and (II) Freedom of Speech, Retaliation – Maryland Declaration of Rights, Article 40.  Plaintiff sues Defendants Roepcke and Webb in their individual and official capacities.  *Id.* ¶¶ 4-5.  Plaintiff seeks: (i) no less than $800,000 in non-economic damages; (ii) alternatively, if compensatory damages are not awarded, an award of nominal damages; (iii) costs and reasonable attorney's fees; (iv) punitive damages of $1,000,0000; and (v) any other relief the court deems just and proper.  (ECF No. 39, pp. 24-26.)

Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF Nos. 40 and 41.)  Defendants argue that sovereign immunity deprives the court of subject matter jurisdiction over the state law claim—Count II— against BPD and the officers in their official capacities.  (ECF No. 40-1, pp. 12-13; ECF No. 41-1, p. 17.)  Moreover, Roepcke argues the claims against him in his official capacity should be dismissed as duplicative because an action against him in his official capacity is an action against BPD.  (ECF No. 41-1, p. 17.)  Finally, Defendants argue that Plaintiff's federal claim—Count I— fails to state a plausible claim.  (ECF No. 40-1, pp. 5, 13; ECF No. 41-1, p. 2.)

## LEGAL STANDARDS

### Federal Rule of Civil Procedure 12(b)(1)

Defendants assert that the court lacks subject matter jurisdiction over Count II because Plaintiff's claim is barred by state sovereign immunity.  (ECF No. 40-1, pp. 12-13; ECF No. 41-1, p. 17.)

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction."  *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016).

"The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction." *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019). Subject matter jurisdiction challenges may proceed in two ways: a facial challenge or a factual challenge. *Id.* A facial challenge asserts "that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction." *Id.* A factual challenge asserts "that the jurisdictional allegations of the complaint [are] not true." *Id.* (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). "In a facial challenge, 'the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Kerns*, 585 F.3d at 192 (instructing that in a facial challenge to subject matter jurisdiction the plaintiff enjoys "the same procedural protection as . . . under a Rule 12(b)(6) consideration.")). "[I]n a factual challenge, 'the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction.'" *Id.*

Defendants raise a facial challenge to the court's subject matter jurisdiction, asserting that the doctrine of sovereign immunity bars Count II. The defense of sovereign immunity is a jurisdictional bar because "sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). Because sovereign immunity is akin to an affirmative defense, a defendant bears the burden of demonstrating that sovereign immunity exists. *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

**Federal Rule of Civil Procedure 12(b)(6)**

BPD argues that Count I fails to state a plausible claim; Roepcke and Webb argue that Counts I and II each fails to state a plausible claim against them in their individual capacities. (ECF No. 40-1, p. 5; ECF No. 41-1, p. 2.)

A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint. It does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Accordingly, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244 (*citing Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "A complaint that provides no more than 'labels and conclusions,' or 'formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. PX-21-1637, 2021 U.S. Dist.

LEXIS 221041, at *4 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

## CONSIDERATION OF EXHIBITS

BPD and Webb attach two exhibits to BPD Motion: Exhibit A – Settlement Order in *Taylor v. Baltimore Police Department*, No. SAG-18-3999 (D. Md. 2018) (ECF No. 40-2) and Exhibit B – Baltimore Police Department 2021 Staffing Plan Update (ECF No. 40-3).

As detailed above, Defendants raise a facial challenge to subject matter jurisdiction. Accordingly, Plaintiff enjoys the procedural protections afforded by a 12(b)(6) motion.  In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court usually does not consider evidence outside of the complaint.  A court may consider documents attached to a motion to dismiss if the document is "integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity."  *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).  "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d. 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)).  "In addition to integral and authentic exhibits, on a 12(b)(6) motion the court 'may properly take judicial notice of matters of public record.'" *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  Specifically, the court may take judicial notice of publicly available information on state and federal government websites without converting the motion to one for summary judgment.  *See U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on the state and federal government websites.").

The Staffing Update (Ex. B; ECF No. 40-3) is neither material to nor relied upon in the Amended Complaint. It memorializes the merger of the Bomb Squad Unit into the MMU. Although Plaintiff alleges he was reassigned to the MMU in retaliation for his protected speech, Plaintiff's rights that form the basis for his claim do not arise out of the "very existence" of Exhibit B; therefore, it is not integral to the Amended Complaint. Accordingly, the court will not consider Exhibit B. Further, the Taylor lawsuit (Ex. A; ECF No. 40-2) is neither material to nor relied upon in the Amended Complaint. Exhibit A is merely a Rule 111 Order[4] in a similar lawsuit. Plaintiff's rights on which he bases his claim do not arise out of the "very existence" of Exhibit A. Therefore, Exhibit A is not integral to the Amended Complaint. Exhibit A is, however, a public record on a federal government website. Accordingly, the court takes judicial notice of Exhibit A and may consider it without converting the BPD Motion into one for summary judgment.

## ANALYSIS

### I.      Count I: 42 U.S.C. § 1983

In Count I, Plaintiff asserts an action against all Defendants for First Amendment Retaliation in violation of 42 U.S.C. § 1983. Defendant officers are sued in their official and individual capacities. (ECF No. 39 ¶¶ 4, 5.) Count I of the Amended Complaint appears to allege both a *Monell* claim[5] against BPD based on policy or custom, as well as a First Amendment Retaliation claim against Webb and Roepcke in their official and individual capacities. *Id.* ¶¶ 57, 59-64.

42 U.S.C. § 1983 provides:

---

[4] Local Rule 111 provides that: "When the Court has been notified by counsel that a case has been settled, the Court may enter an order dismissing the case and providing for the payment of costs." Local Rule 111 (D. Md. 2021).

[5] As discussed more fully below, in *Monell v. Department of Social Services*, the Supreme Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, 694 (1978).

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . ."

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States."  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009).  "The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement—and the analysis for each is identical."  *Philips*, 572 F.3d at 180.

### A.    Baltimore City Police Department

#### 1.  State Action

In *Monell v. Department of Social Services*, the Supreme Court concluded that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies."  436 U.S. 658, 690 (1978).  The Court further explained that "[l]ocal governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.*  A state agency, however, cannot be sued under § 1983 because a state agency is not a "person" under 42 U.S.C. § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989).

In *Chin v. City of Baltimore*, the court held that BPD is subject to suit for violation of § 1983 because it "is too interconnected with the government of the City" to constitute a state agency.  241 F. Supp. 2d 546, 548 (D. Md. 2003).  This court has repeatedly affirmed the holding in *Chin*.  *See, e.g.*, *Nicholson v. Balt. Police Dep't*, No. DKC-20-3146, 2021 U.S. Dist. LEXIS

10

75798, at *16 (D. Md. Apr. 20, 2021) (holding that "the BPD, while a state entity under Maryland law, is considered a municipal entity subject to suit for purposes of § 1983"); *Fish v. Mayor of Balt.*, CCB-17-1438, 2018 U.S. Dist. LEXIS 4222, at *9 (D. Md. Jan. 10, 2018) (holding that "BPD is not entitled to Eleventh Amendment immunity and, as a result, is a 'person' subject to suit under § 1983").  Accordingly, for purposes of an action for violation of § 1983, BPD is a local government entity.

### 2.  *Monell Claim*

In order to state a § 1983 *Monell* claim against a municipality, Plaintiff must ". . . adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) ("it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom").  However, "a municipality cannot be held liable . . . under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691.  Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

A plaintiff may allege four types of policies, customs, or practices for which a municipality may be held liable:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.[6]

---

[6] As discussed in more detail below, the fourth type is commonly referred to as a "condonation theory" of liability.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter*, 164 F.3d at 217).  Regardless of which theory a plaintiff proceeds under, all *Monell* claims require three elements: (1) identity of a specific "policy or "custom"; (2) attribution of the policy, and fault for its creation, to the municipality; and (3) an "affirmative link" between an identified policy or custom and a specific rights violation.  *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

### i.  *Custom or Policy*

While BPD argues that Plaintiff fails to plead a *Monell* claim based upon failure to train and unofficial policy or custom, Plaintiff clarifies in his response that he pleads a *Monell* claim against BPD under a "condonation theory" of liability.  (ECF No. 44-1, p. 25; *see* n.6, *supra*.)

Under a theory of "custom by condonation," a municipality violates § 1983 if "municipal policy makers fail to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell*, 824 F.2d at 1389-90) (internal quotation marks omitted); *see also Monell*, 436 U.S. at 690-91 (citing and quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, (1970)) (holding that "'[o]fficial policy' is not the only basis for imposing municipal liability. 'Custom, or usage,' in the exact language of § 1983, may also serve.  And the existence of such a 'custom or usage' may be found in 'persistent and widespread . . . practices of [municipal] officials [which] although not authorized by written law, [are] so permanent and well-settled as to [have] the force of law.'").  Accordingly, the court will analyze Plaintiff's *Monell* claim as one brought under a custom by condonation theory of liability.

A municipal custom may arise if unconstitutional practices become so "'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'"  *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691).  A "custom or usage may

then become the basis of municipal liability, but only if its continued existence can be laid to the fault of municipal policymakers, and a sufficient causal connection between the 'municipal custom and usage' and the specific violation can then be established." *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). "Municipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." *Id.* at 1391; *see also Owens*, 767 F.3d at 402 (citing *Spell*, 824 F.2d at 1386-91) (holding that to state a claim under § 1983 based on a condonation theory of liability, a plaintiff must allege "a persistent and widespread practice[] of municipal officials, the duration and frequency of which indicate that policy makers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference").

"Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-403 (quoting *Spell*, 824 F.2d at 1391). "Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Id.* at 403 (quoting *Spell*, 824 F.2d at 1387). Further, a policy or custom that gives rise to § 1983 liability will not "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan v. Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). "Only when a municipality's conduct demonstrates a 'deliberate indifference' to the rights of its inhabitants can the conduct be properly thought as a 'policy or custom' actionable under § 1983." *Nicholson v. Balt. Police Dep't*, No. DKC 20-3146, 2021 U.S. Dist. LEXIS 75798, at *22 (D. Md. Apr. 20, 2021) (quoting *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997)).

BPD argues that Plaintiff fails to allege a "single fact" to support his claim that BPD has a policy or custom of unfettered retaliation against whistleblowers, and instead alleges merely "his own personal squabbles with Roepcke."  (ECF No. 40-1, p. 10.)  In addition, BPD argues that Plaintiff's allegations of isolated unconstitutional acts are insufficient to meet the "deliberate indifference" standard.  *Id.*  In support, BPD relies on *Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003), and *Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999).

BPD is correct that to prevail on the merits of a *Monell* claim, a plaintiff must provide "numerous particular instances of unconstitutional conduct in order to establish a custom or practice."  *Lytle*, 326 F.3d at 468 (affirming summary judgment because deprivation of rights was not caused by a municipal policy or custom); *see also Carter*, 164 F.3d at 220 (affirming summary judgment).  "To survive a motion to dismiss under Rule 12(b)(6), [however,] a plaintiff need only support his condonation claim with facts which, if true, 'state a claim to relief that is plausible on its face.'"  *Jones v. Jordan*, No. GLR-16-2662, 2017 U.S. Dist. LEXIS 150701, at *21-22 (D. Md. Sept. 18, 2017) (quoting *Owens*, 767 F.3d at 403 that "simply alleging" a *Monell* claim is easier than prevailing on the merits).

*Monell* claims survive if the plaintiff alleges facts to support that the defendant "was aware of ongoing constitutional violations" and "did nothing to stop or correct those actions."  *Smith v. Aita*, No. CCB-14-3487, 2016 U.S. Dist. LEXIS 90029, at *13 (D. Md. July 12, 2016); *see Garcia v. Montgomery Cnty.*, No. JFM-12-3592, 2013 U.S. Dist. LEXIS 120659, at *14-15 (D. Md. Aug. 23, 2013) (denying motion to dismiss on the basis that the plaintiff alleged that the defendant "was aware of the ongoing constitutional violations by MCPD officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop"); *McDowell*, 2018 U.S. Dist. LEXIS 133289, at *15 (denying motion to dismiss because

the plaintiff alleged sufficient facts that the defendant "had knowledge of, and was deliberately indifferent to, officers' practice of unconstitutional conduct"); *Jones*, 2017 U.S. Dist. LEXIS 150701, at *26 (denying motion to dismiss on the basis that the facts were sufficient to plead that the defendant was aware of police officers' ongoing violations).

In *Garcia v. Montgomery County*, the court disagreed with the "defendants' assertion that [the plaintiff's] complaint mentions only his incident and that he has pled nothing more than an isolated deprivation," and instead found the plaintiff had adequately stated a claim because the complaint alleged that the defendant "was aware of unconstitutional actions by MCPD officers directed towards members of the media but chose to ignore such behavior." 2013 U.S. Dist. LEXIS 120659, at *14.  Accordingly, a plaintiff is not required to "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339-40 (4th Cir. 1994).  In contrast, in *Corbitt v. Baltimore City Police Department*, the court granted the defendant's motion to dismiss a *Monell* claim because the plaintiff asserted "absolutely no facts to support his contention that the BPD . . . condoned the activity of BPD Officers." 2021 U.S. Dist. LEXIS 149996, at *20.  In addition, the *Corbitt* court reasoned that there were no allegations as to whether there had been similar incidents or whether BPD was aware of the alleged improper conduct.  *Id.*

In this case, Plaintiff alleges that, despite BPD's express anti-retaliation/whistleblower policy, BPD operates under a "policy or custom of unfettered retaliation against whistleblowers and/or officers that exercise their First Amendment Rights."  (ECF No. 39 ¶ 48, p. 21.)  To support this charge, Plaintiff alleges:

> On July 21, 2020, the Plaintiff authored an email to his chain of command addressing concerns with allowing Sgt. Roepcke to attend HDS . . . Lt. Klein ignored Plaintiff

15

Mealey's protestations, instructing him to go forward with Sgt. Roepcke's application. Defendant Roepcke then responded to the email, reminding Plaintiff Mealey that "Only one of us was at Major Webb's wedding." This was obviously referencing his close personal relationship with Major Webb and his influence within the Department and the BPD command staff.

. . .

On or about September 11, 2020 Officer Mealey submitted a Form 95 to Major Webb detailing a policy violation by Sgt. Roepcke during a suspected IED response mission. Counter to orders and policy, Sgt. Roepcke entered the restricted perimeter and leaned on the truck suspected to contain the IED while the Bomb Squad started SAD/RSP (separate, analyze, and disassemble/render safe procedure). No disciplinary action was taken against Sgt. Roepcke.

. . .

On February 16, 2021, Plaintiff Mealey prepared a Form 95 detailing the incident and submitted same to Major Webb. Defendant Roepcke prepared multiple First Report of Injury at the direction of Lt. Klein as he was dissatisfied with the manner in which Sgt. Roepcke prepared the reports. He initially listed Plaintiff Mealey for being at fault for the incident even though Sgt. Roepcke and the BPD command staff were aware of the illegal electrical hook-up. Despite outlining the specific facts and providing photographic proof of the illegal electrical hook-up, installed under the direction and with the knowledge of Sgt. Roepcke, Major Webb did not institute an[y] disciplinary action against Sgt. Roepcke.

. . .

Within approximately one week of being notified of the OIG's investigation, the BPD, through Deputy Commissioner Briscoe, met with members of the Bomb Squad and advised that they were no longer going to be full-time, stand alone unit and the officer assigned to the Bomb Squad would be reassigned to the Mobile Metro Unit . . .

. . .

On or about October 31, 2021, the members of the Bomb Squad were transferred to the Mobile Metro Unit after being advised that they were still expected to train and respond to bomb calls. They were also advised that they could no longer wear their green Bomb Squad uniforms but would need to wear blue uniforms similar to other member[s] of the Department.

. . .

These actions were undertaken by the BPD in response to the mounting accusations against Sgt. Roepcke and to exercise more control over Plaintiff Mealey and to serve in effect to be a demotion from the Bomb Squad.

. . .

Likewise, the BPD, by and through its Command Staff, including but not limited Major Webb, have violated Officer Mealey's First Amendment Protections and continue to allow

16

Sgt. Roepcke to take improper retaliatory actions.  Officer Mealey disclosed to Major Webb that he was the source of information or "deep throat" of the OIG's investigation.[7]

. . .

. . . The BPD was aware of the pattern and practice of protecting Sgt. Roepcke while he engaged in improper retaliatory and harassing behaviors in violation of the Plaintiff's First Amendment Rights.

. . .

As a result of Officer Mealey engaging in his First Amendment rights, he was unjustifiably subjected to retaliation, harassment, threats, and intolerable and hostile work conditions, including but not necessarily limited to, (i) being charged departmentally by Sgt. Roepcke in PIB/IA Case Nos. 2019-1311, 2019-1823, 2020-0974, 2021-0227, and 2021-0431; (ii) Being suspended from work, without pay, for 16 days as a result of Sgt. Roepcke's retaliatory charging practice; (iii) Sgt. Roepcke's numerous 95 complaints to Major Webb and/or others regarding Officer Mealey, including the request to immediately replace him as the BSC; (iv) being threatened with removal from the Bomb Squad and as the BSC by Major Webb if he failed to endorse Sgt. Roepcke's HDS application.

. . .

The harassment and retaliation and other harms inflicted upon Officer Mealey for engaging in his First Amendment rights results from an official policy or custom of the City and the BPD.   The City and BPD inadequately implements, trains and/or supervises BPD commanders or other managing personnel, including but not limited to Sgt. Roepcke and/or Major Webb, in adhering to and/or enforcing BPD Policy No. 1729.

(ECF No. 39 ¶¶ 23, 31, 45, 59, 61, 62, 65, 57, 58, 59.)[8]

Although the Amended Complaint contains more specific allegations involving incidents with Roepcke and Webb than BPD, the general allegations of BPD's awareness of the officers' alleged unconstitutional conduct are sufficient to survive a motion to dismiss.  At this stage, it is enough that Plaintiff alleges that BPD was aware of the alleged pattern and practice of BPD officers, particularly Webb and Roepcke, engaging in retaliation and harassment, and that BPD did nothing to stop those actions.  *See Smith*, *supra*; *see Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994) (noting that "section 1983 claims are not subject to a 'heightened pleading

---

[7] The court notes that the numbering in the Amended Complaint is not consistent.  The allegation that "Likewise, the BPD, by and through its Command Staff, including but not limited Major Webb, have violated Officer Mealey's First Amendment Protections . . ." is cited at ".65" at ECF No. 39, p. 21.

[8] *See* n.7, *supra*.  The court cites to ECF No. 39 ¶¶ 57-59 on pp. 23-24 and ECF No. 39 ¶ 59 on p. 20.

standard' paralleling the rigors of proof demanded on the merits").  That BPD officers allegedly retaliated against Plaintiff on numerous occasions after he engaged in alleged protected speech, if true, could establish a "persistent and widespread pattern of practice."  *Owens*, 767 F.3d at 402-403.  Accordingly, Plaintiff has alleged a *Monell* claim under a theory of condonation against BPD and the court will deny the BPD Motion as to Count I for that purpose.

> **B.**     **Count I: 42 U.S.C. § 1983 against Officers**

> ***1.  Section 1983 Claim against Officers in Their Official Capacities***

To the extent Count I states a § 1983 claim against Webb and Roepcke in their official capacities, the claim is duplicative of the *Monell* claim against BPD because "an official capacity claim . . . is a claim against a government entity of which an agent is an officer."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "Where . . . a plaintiff sues both individual officers in their official capacities under § 1983, and a municipality under *Monell*, for following a particular 'policy or custom' that resulted in alleged constitutional harm, the claims are duplicative."  *Cottman v. Balt. Police Dep't*, No. SAG-21-837, 2022 U.S. Dist. LEXIS 7637, at *17 (D. Md. Jan. 13, 2022).

Here, the allegations in Count I assert a *Monell* claim against BPD and official capacity claims against the individual officers based on the same alleged conduct – retaliation and harassment for exercising First Amendment rights.  Count I will be dismissed as duplicative to the extent Plaintiff brings an official capacity claim under § 1983 against Roepcke and Webb in their official capacities as BPD officers.  Accordingly, the court will grant the BPD Motion as to Count I against Webb in his official capacity and Roepcke's Motion as to Count I against him in his official capacity.

## 2. *Section 1983 against Officers in Their Individual Capacities*

Count I of the Amended Complaint also states a § 1983 claim against Defendants Roepcke and Webb in their individual capacities.  (ECF No. 39, pp. 2-3, 22.)

"In order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). "[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Plaintiff alleges, and Defendants do not dispute, that Webb and Roepcke were at all times relevant to the Amended Complaint acting in their capacities as agents, servants, and employees of the BPD.  (ECF No. 39 ¶¶ 4-5.)  Further, Plaintiff alleges that Webb and Roepcke were at all relevant times acting within normal scope of their employment.  *Id.* ¶ 6.

The First Amendment "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993).  Further, "[a]lthough 'speech' does not have to be spoken to be protected under the first amendment . . . the Supreme Court has repeatedly rejected 'the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.'" *Dennison v. Cnty. of Frederick*, 921 F.2d 50, 53-54 (4th Cir. 1990) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)) (holding that the plaintiff's first amendment right to freedom of speech could not have

been violated when the dispute centered around a general course of conduct, and the plaintiff could not identify any particular speech, expression, or opinion).

"To state a colorable First Amendment retaliation claim, a plaintiff 'must allege that (1) []he engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct.'" *Martin v. Duffy,* 977 F.3d 294, 299 (4th Cir. 2020) (quoting *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)).

Plaintiff alleges that he engaged in four different types of speech that warrant First Amendment protection: (1) Plaintiff participated in the OIG's investigation; (2) was a material witness against Sgt. Roepcke in the Taylor matter; (3) he communicated with Sgt. Ademek as to Sgt. Roepcke's unsuitability for HDS; and (4) he directly reported to the OIG the harassment and retaliation undertaken by Sgt. Roepcke, Major Webb, and others within the command staff of BPD. (ECF No. 39 ¶ 57.)

Specifically, Plaintiff alleges that he met with Deputy Inspector General Gerald D'Angelo, and that he provided substantive information detailing Sgt. Roepcke's waste of taxpayer funding, breaches of BPD policy, and fraudulent procurement of an underwater saw, among other information. (ECF No. 39 ¶ 11.) Plaintiff alleges he was the primary witness and source of information. *Id.* Plaintiff further alleges that he told OIG investigators that Roepcke asked to use a detonation cord in the Danger Zone, despite the fact that he was not qualified to use explosives. *Id.* ¶ 13. The court is satisfied that Plaintiff adequately alleges the general information and opinions he provided in the OIG investigation.

In response, Roepcke and Webb mount several 12(b)(6) defenses. Roepcke and Webb dispute that Plaintiff has adequately pled that he engaged in First Amendment protected activity. (ECF No. 40-1, pp. 18-19.) They also urge that Plaintiff fails to satisfactorily plead the requisite causal relationship between his speech and their alleged retaliatory acts. (*Id.* at p. 14; ECF No. 41-1, p. 14.) Roepcke argues that Plaintiff's allegation that he was retaliated against for cooperating/participating in the OIG's investigation regarding the Danger Zone fails because Plaintiff does not identify the alleged speech at issue.[9] (ECF No. 41-1, p. 12.) Webb disputes that the disbandment of the Bomb Squad satisfactorily pleads a retaliatory act. (ECF No. 40-1, p. 19.)

### a. Protected First Amendment Activity

In *Garcetti v. Ceballos*, the Supreme Court set forth the necessary inquiry "to guide interpretation of constitutional protections accorded to public employee speech." 547 U.S. 410, 418 (2006). First, the court must ask "whether the employee spoke as a citizen on a matter of public concern." *Id.* "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* "If the answer is yes, then the possibility of a First Amendment claim arises." *Id.*

In *Garcetti*, Ceballos was a deputy district attorney for the Los Angeles County District Attorney's Office. 547 U.S. 410, 413 (2006). After examining an affidavit police submitted to obtain a search warrant, Ceballos concluded the affidavit contained serious misrepresentations. He relayed his concerns in a memo to his supervisors and recommended the case be dismissed. *Id.* at 414. The criminal prosecution proceeded nonetheless; and Ceballos testified for the defense regarding his observations regarding the search warrant affidavit. *Id.* at 414-15. On the basis that his supervisors and the county retaliated against him based on his memo, Ceballos sued for § 1983

---

[9] As stated above, the court is satisfied that Plaintiff adequately alleges the general information and opinions he provided in the OIG investigation.

violations. *Id.* at 415. The Court found that the memo did not provide the basis for a First Amendment retaliation claim because Ceballos wrote it "pursuant to his duties as a calendar deputy." *Id.* at 421. The Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* Thus, for Plaintiff's alleged speech to give rise to a First Amendment retaliation claim (1) he must have been speaking as a private citizen (not pursuant to his official duties as a law enforcement officer); and (2) the speech must address a matter of public concern.

### i.    *Speech as a Private Citizen*

Roepcke and Webb argue that Plaintiff's speech regarding Roepcke's HDS application was pursuant to Plaintiff's role as a Bomb Squad Commander and not as a private citizen. (ECF No. 40-1, p. 18; ECF No. 41-1, p. 15.) In response, Plaintiff contends that he was not fulfilling any official duty with BPD by voicing his concerns to the FBI and Sgt. John Adamek. (ECF No. 44-1, p. 14.)

As set forth above, to state a First Amendment retaliation claim, a public employee must allege he spoke as a citizen, not "pursuant to his or her official responsibilities." *Garcetti*, 547 U.S. at 424. Whether the speech occurred in the workplace is not dispositive; neither is whether the subject matter relates to the speaker's job. *See id.* at 420-21 (finding that the fact that the plaintiff expressed his views inside his office, rather than publicly, and the fact that the memo concerned a subject matter of his employment was not dispositive).

Further, courts have found that whether an individual acted pursuant to official duties requires fact finding to conduct the requisite legal analysis rendering it a poor candidate for 12(b)(6) disposition. *Crystal v. Batts*, No. JKB-14-3989, 2015 U.S. Dist. LEXIS 129825, at *18

(D. Md. Sept. 25, 2015) (explaining that the "official duties analysis is a mixed question of fact and law, and more factual development is necessary before it can be resolved"); *see Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009) (finding that whether the memorandum written by BPD officer "was written as part of his official duties was a disputed issue of material fact that cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)").

In *Andrew v. Clark*, Andrew was employed by the Baltimore Police Department as a commander. 561 F.3d 261, 264 (4th Cir. 2009). Andrew responded to a barricade situation and requested a Technical Assistance Response Unit to gain additional intelligence into the situation. *Id.* Eventually, the unit entered the suspect's apartment and killed the suspect. *Id.* After the incident, Andrew requested that BPD include him in the review of the investigation; however, he was not included in the investigation. *Id.* As a result, Andrew submitted a memo to the defendant, Kevin Clark, expressing his concern regarding the shooting. *Id.* After Clark ignored Andrew's memo, Andrew, out of concern for public safety, provided his memo to the Baltimore Sun. *Id.* at 264-65. Thereafter, the Baltimore Sun published an article about the shooting and highlighted the concerns Andrew raised in his memo. *Id.* at 265. After publication of the Baltimore Sun article, the BPD subjected Andrew to an Internal Affairs investigation, charged him with giving confidential information to the media, placed him in a less desirable position, and eventually terminated his employment. *Id.* On the basis that BPD officers retaliated against him based on his memo, Andrew sued for § 1983 violations. *Andrew v. Clark*, 472 F. Supp. 2d 659, 659 (D. Md. 2007). The district court dismissed Andrew's First Amendment retaliation claim, reasoning that "[n]o reasonable juror could reasonably find that the 'internal memorandum' was other than 'speech pursuant to plaintiff's official duties.'" *Id.* at 663.

On appeal, the Fourth Circuit noted that Andrew alleged that he "was not under a duty to write the memorandum as part of his official responsibilities . . . [and] [h]e had not previously written similar memoranda after other officer involved shootings." *Id.* at 265. Accordingly, the Fourth Circuit it found that the district court erred in dismissing Andrew's First Amendment retaliation claim and determined that whether Andrew's memo "was written as part of his official duties was a disputed issue of material fact that cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)." *Id.* at 267.

Here, Plaintiff alleges that his statements to the OIG regarding the Danger Zone investigation were made as a private citizen. (ECF No. 39 ¶ 11.) Plaintiff further alleges, and Roepcke and Webb do not dispute, that his statements in the Taylor matter were made as a private citizen. *Id.* ¶ 55. The parties do dispute whether Plaintiff's memo written to the FBI expressing his concerns about Roepcke's suitability for the HDS was made pursuant to his official duties. Plaintiff concedes that when he initially expressed concern about signing Roepcke's HDS application that his speech was pursuant to his official duties because "he was required to follow criteria set forth in Section 3 of the National Guidelines." *Id.* ¶ 24. However, after Plaintiff signed Roepcke's HDS application, Plaintiff alleges:

> Thereafter, Officer Mealey, as a matter of public concern, contacted the local FBI coordinator to find out how he should proceed, given his reservations about Sgt. Roepcke's lack of suitability for Bomb School. He was advised to contact Sgt. John Adamek at the National Bomb Squad Commanders Advisory Board, which he did. Sgt. Adamek told Officer Mealey to put his thoughts together in writing and that he would forward it to the appropriate personnel. In addition, Sgt. Adamek explained that he was already familiar with Sgt. Roepcke since he had received a number of inquiries regarding Sgt. Roepcke's application.
>
> . . .
>
> Officer Mealey, as a matter of public concern, sent a letter to Sgt. Adamek, identifying his concerns regarding the eligibility of Sgt. Roepcke to become a Bomb Technician . . .

(ECF No. 39 ¶¶ 25, 26.)

24

Plaintiff alleges he contacted the FBI as a concerned citizen; and specifically differentiates his speech regarding his resistance to signing the HDS application from his letter to Sgt. Adamek. (ECF No. 39 ¶¶ 25, 26.)  Whether Plaintiff acted as a private citizen, outside the scope of his official duties, when he wrote a letter to Sgt. Adamek requires a fulsome factual record and is better resolved at trial or perhaps on a Rule 56 motion.  Accordingly, the court makes no finding as to whether the memo was written pursuant to Plaintiff's official duties or as a private citizen.

### ii.     Public Concern

Roepcke argues that Plaintiff's speech regarding the OIG's Danger Zone investigation does not relate to a matter of public concern.  (ECF No. 41-1, p. 12.)

"[T]o trigger First Amendment protection, the speech at issue must relate to matters of public interest."  *Hanton v. Gilbert*, 36 F.3d 4, 6 (4th Cir. 1994).  "[T]he answer to the public concern inquiry rests on whether the public or community is likely to be truly concerned with or interested in the particular express, or whether it is more properly viewed as essentially a private matter between employer and employee."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999).  The court must consider "the content, form, and context of a given statement, *as revealed by the whole record*."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

The Fourth Circuit has held that speech involving law enforcement misconduct is a matter of public concern.  *See, e.g., Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (holding that "an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be interested."); *Durham v. Jones*, 737 F.3d 291, 300 (4th Cir. 2013) (concluding that "overarching allegations of serious and pervasive law enforcement misconduct" is a matter of public concern).  Additionally, a waste of taxpayer resources and police officer safety concerns are matters of public concern.  *Supinger v. Virginia*, 259 F. Supp. 3d 419, 443-44 (W.D. Va. 2017)

(holding that speech relating "to fraud and breach of the public trust within the upper ranks of a law enforcement agency" is a matter of public concern).  Further, "matters relating to public safety are quintessential matters of 'public concern.'"  *Goldstein v. Chestnut Ridge Vol. Fire Co.*, 218 F.3d 337, 353 (4th Cir. 2000).

In addition to the contents of Plaintiff's alleged statements, the court must also consider the form and context of the dissemination of the speech.  *Connick*, 461 U.S. at 147-48.  In *Supinger*, the court concluded that because the plaintiff "took his concerns to various public officials, it is more likely that he was speaking on a[n] 'issue of social, political, or other interest to a community.'"  259 F. Supp. 3d at 445 (quoting *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007)); *see also Durham*, 737 F.3d at 300 (concluding that the form or platform of the plaintiff's speech, such as sending the statements to a broad audience, support a finding of public concern).

Here, Plaintiff alleges:

. . . [b]etween February 2019 and July 2019, when the OIG issued their report, Officer Mealey provided substantive information and documentation to the OIG for OIG Case No. 19-0027-I detailing Sgt. Roepcke's waste of taxpayer funding, breaches of BPD policy, and fraudulent procurement of an underwater saw, among other information.  Other than Officer Taylor, who initialed the investigation, Officer Mealey was the primary witness and source of information . . . .

. . .

Officer Mealey and others within the Bomb Squad told OIG investigators that Sgt. Roepcke asked to use detonation cord in the Danger Zone salvage operation, despite the fact that he was not qualified to use explosives.

. . .

Thereafter, Officer Mealey, as a matter of public concern, contacted the FBI coordinator to find out how he should proceed, given his reservations about Sgt. Roepcke's lack of suitability for Bomb School . . . .

(ECF No. 39 ¶¶ 11, 13, 25.)

It is plausible that Roepcke's alleged taxpayer funding waste and breaches of BPD policies, if true, raise issues "of social, political, or other interest to the community."  *Galloway*, 483 F.3d

at 267; *see also Maciariello and Supinger, supra.* It is also plausible that Roepcke's unsuitability for Bomb Squad School, if true, raises a public safety issue. Importantly, however, the court notes that the public concern inquiry is determined "by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Thus, resolution of this question "will depend upon the results of discovery as tested by a motion for summary judgment." *See Andrew*, *supra*. Accordingly, at this stage, the court accepts Plaintiff's allegations as true and finds plausible that Plaintiff's speech bore on issues of public concern.

**b.  Retaliatory Action**

Webb argues that disbandment of the Bomb Squad does not satisfactorily plead a retaliatory act. (ECF No. 40-1, p. 19.)

"The proper standard for determining whether a retaliatory action occurred for the purposes of a public employee's First Amendment claim is whether the plaintiff was 'deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights.'" *Miller v. Hamm*, No. CCB-10-243, 2011 U.S. Dist. LEXIS 141, at *21-22 (D. Md. Jan. 3, 2011) (quoting *Goldstein*, 218 F.3d at 352). This inquiry is fact intensive. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (explaining that to determine "whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speak, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts").

"[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). A transfer or

reassignment may constitute an adverse employment action. *Thomas v. Belton*, 2018 U.S. Dist. LEXIS 199831, at *40 (D. Md. Nov. 26, 2018); *see Love-Lane v. Martin*, 355 F.3d 766, 779-80 (4th Cir. 2004) (holding that "transfer or reassignment, which was a demotion in duties and responsibilities, qualifies as an adverse employment action for purposes of her speech claim.").

Plaintiff alleges:

On August 25, 2021, Major Webb refused to consider the plaintiff as a driver of the command vehicle when the former driver retired, even though the Plaintiff possesses a Commercial Driver's License and had previously been called upon to operate the command vehicle. The BPD sent a general email asking for those who were qualified and Plaintiff Mealey responded. However, he was not considered for the position due to Major Webb's refusal to consider his request. Major Webb's refusal to consider Plaintiff Mealey was communicated to Major Corbett. This was in direct retaliation for the Plaintiff's whistleblowing activities and his role in Sgt. Roepcke's ban from HDS.

. . .

On or about October 18, 2021, Deputy Inspector General brooks agreed to investigate Plaintiff Mealey's claims. On that same date, Deputy Inspector General Brooks sent a Notification to the Chief of Staff of the BPD advising that they were investigating Plaintiff Mealey's complaints of retaliation and harassment following protected First-Amendment actions.

. . .

Within approximately one week of being notified of the OIG's investigation, the BPD, through Deputy Commissioner Briscoe, met with members of the Bomb Squad and advised that they were no longer going to be a full-time, stand alone unit and the officer assigned to the Bomb Squad would be reassigned to the Mobile Metro Unit. Plaintiff Mealey was not present for that meeting. It was not during the meeting, however, that he was "not commander of anything."

. . .

On or about October 31, 2021, the members of the Bomb Squad were transferred to the Mobile Metro Unit after being advised that they were still expected to train and respond to bomb calls. They were also advised that they could no longer wear their green Bomb Squad uniforms but would need to wear blue uniforms similar to other member[s] of the Department.

(ECF No. 39 ¶¶ 50, 58, 59, 61.)[10]  Plaintiff further alleges that Webb engaged in retaliatory action by (1) ordering him to sign Roepcke's application; and (2) by failing to investigate Plaintiff's

---

[10] The citations here are to ECF No. 39, pp. 18, 20.

complaints. *Id.* ¶¶ 22, 31, 35, 45.  In addition, Plaintiff alleges that Roepcke engaged in retaliatory action by (1) filing complaints and departmental charges against him; and (2) attempting to have Plaintiff charged and transferred.  *Id.* ¶¶ 16, 17, 29, 39, 44, 46, 52, 54, 35, 45, 50.  Plaintiff also alleges that he was suspended from work without pay for 16 days as a result of Roepcke's retaliatory charging practices.  *Id.* ¶ 58.

Whether Plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact-intensive inquiry.  *See Saurez*, *supra*.  Transfer to the MMU and Webb's alleged refusal to consider Plaintiff for the command driver position adequately allege adverse employment action for purposes of First Amendment retaliation.

### c.  <u>Causal Connection</u>

For a First Amendment retaliation claim, a plaintiff must "allege a causal connection between [the] First Amendment activity and the alleged adverse action."  *Constantine*, 411 F.3d at 501.  "A plaintiff must plead facts showing 'that the protected speech was a substantial factor in the decision to take the allegedly retaliatory action.'"  *Miller v. Hamm*, No. CCB-10-243, 2011 U.S. Dist. LEXIS 141, at *23 (D. Md. Jan. 3, 2011) (quoting *Goldstein v. Chestnut Ridge Vol. Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000)); *see also Crystal v. Batts*, No. JKB-14-3989, 2015 U.S. Dist. LEXIS 129825, at *24 (D. Md. Sep. 25, 2015) (quoting *Miller*, 2011 U.S. Dist. LEXIS 141, at *23) (concluding that the motion to dismiss should be denied if the plaintiff "has set forth sufficient facts to make it plausible that his protected expression was a substantial factor in his adverse employment action").

Webb and Roepcke argue that Plaintiff fails to allege a causal connection exists between Defendants' acts and omissions and Plaintiff's protected speech.  (ECF No. 40-1, p. 14; ECF No. 41-1, p. 14.)

### i.    *Roepcke Causation*

Roepcke argues that Plaintiff fails to allege facts that Roepcke knew that Plaintiff spoke to the OIG or what Plaintiff said to the OIG.  (ECF No. 41-1, p. 14.)  In support, Defendant Roepcke relies on *Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474 (4th Cir. 2005).

In *Constantine*, the Fourth Circuit reversed the district court's dismissal of the plaintiff's First Amendment retaliation claim, and held that the plaintiff adequately alleged a First Amendment retaliation claim.  *Id.* at 479, 501.  Regarding proof of causation, the court explained:

> In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity. *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998). "Knowledge alone, however, does not establish a causal connection" between the protected activity and the adverse action." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004).  There must also be some degree of temporal proximity to suggest a causal connection. "A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse . . . . action . . . negates any inference that a causal connection exists between the two."  *Dowe*, 145 F.3d at 657.

*Constantine*, 411 F.3d at 501.

While the court recognizes that *Constantine* was before the court on appeal of a 12(b)(6) dismissal, this portion of the court's discussion pertains to demonstration of causation at the summary judgment stage; the cases cited in this passage of the *Constantine* decision are appeals from entry summary judgment.  *See Price*, 380 F.3d at 217 (concluding that the district court "did not err when it granted the defendant summary judgment"), and *Dowe*, 145 F.3d at 660 (concluding that the district court did not err in granting the defendant's motion for summary judgment).  As stated above, Plaintiff must allege "sufficient facts to make it plausible that his protected

expression was a substantial factor in the decision to take the allegedly retaliatory action." *See Miller*, *supra*.

Plaintiff alleges that Roepcke was aware of statements made in connection to the OIG investigation in July 2019 and that, in that same time period, specifically by July 201,9 Roepcke had filed complaints against Plaintiff. (ECF No. 39 ¶¶ 11, 15-17.) The temporal proximity of the OIG report regarding the Danger Zone investigation and the filing of complaints by Roepcke sufficiently supports causal connection for 12(b)(6) purposes. *See Constantine*, *supra*. Further, within approximately one month of learning that his HDS application was terminated, Roepcke filed another complaint against Plaintiff. (*Id.* ¶¶ 30, 33.) One month time is not such a "lengthy time lapse" to destroy or negate causal connection. *See Dowe*, *supra*. The court is satisfied that Plaintiff has pled sufficient facts to support the requisite causal connection between protected speech and Roepcke's alleged retaliatory actions.

### ii.    *Webb Causation*

Webb argues that Plaintiff fails to plead facts to support the requisite causal connection between Webb's alleged actions and omissions, and Plaintiff's alleged protected speech. (ECF No. 40-1, p. 14.) Specifically, Webb asserts that the near year between OIG's Danger Zone report and Webb's order that Plaintiff sign Roepcke's HDS application is too attenuated to sufficiently plead causation. (ECF No. 40-1, p. 17.)

The OIG report was released in July 2019. (ECF No. 39 ¶ 11.) Shortly thereafter, Webb became aware of Plaintiff's role in the investigation. (*Id.* ¶ 15.) Plaintiff alleges Webb first retaliated against him between July 5 and 21, 2020 – almost a year after the OIG issued its report. *Id.* ¶¶ 19, 22-23. Plaintiff further alleges:

- Webb failed to properly investigate his complaints against Roepcke.

- On September 14, 2020, Plaintiff provided a copy of the FBI's letter to Webb.

- On October 5, 2020, Roepcke sent a Form 95 complaint to Webb regarding Plaintiff.

- Plaintiff wrote a Form 95 to Webb advising him that Roepcke was targeting and harassing him in retaliation.

- Webb took no action to investigate, inform his superiors of the harassment, or protect Plaintiff.

- Plaintiff provided Webb the HDS appeal decision for Roepcke on November 25, 2020.

- On January 6, 2021, Plaintiff submitted another Form 95 to Webb regarding Roepcke; Webb failed to take action.

- On February 16, 2021, Plaintiff submitted another Form 95 to Webb regarding Roepcke; Webb failed to take action.

- In August 2021, Webb refused to consider Plaintiff for the position of command vehicle driver.

- Between February and August 2021, Plaintiff was subject to departmental charges and, as a result, was suspended without pay for 16 days.

(ECF No. 39 ¶¶ 32-33, 35, 40, 43, 45-46, 48, 50.)

In *Tobey v. Jones*, the Fourth Circuit discussed the "but for" causation requirement of a First Amendment retaliation claim and noted that on a 12(b)(6) motion, the court "can infer causation based on the facts" alleged.  706 F.3d 379, 390 (4th Cir. 2013).  Whether discovery has born the requisite fruit to satisfy the rigorous causation standard will be evaluated on a different day.  On this day, however, the court is satisfied that causation is ably pled.

In sum, Plaintiff alleges he was ordered to sign Roepcke's application, his complaints were ignored, and he was not considered for a position due to the OIG investigation and his role in Roepcke's HDS application.  Plaintiff further alleges numerous intervening events as described

32

above – which occurred after the OIG investigation and before Webb ordered Plaintiff to sign Roepcke's application.   Taken together, these allegations are sufficient to infer a casual link between Plaintiff's speech and Webb's alleged retaliation.

## II.   Count II: State Law Claim against BPD, and Webb and Roepcke in their Official Capacities

### A.   Baltimore Police Department

In Count II, Plaintiff asserts a claim against BPD, Webb, and Roepcke under the Maryland Declaration of Rights.   (ECF No. 39, p. 25.)   BPD argues it is entitled to sovereign immunity. (ECF No. 40-1, p. 12.)

"[A]lthough the BPD is not immune from suit under Section 1983 pursuant to the Eleventh Amendment, 'with respect to state law causes of action, the result is different.'"   *Corbitt v. Balt. City Police Dep't*, No. RDB-20-3431, 2021 U.S. Dist. LEXIS 149996, at *21 (D. Md. Aug. 10, 2021) (quoting *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003)).   "State sovereign immunity protects the State not only from damages actions for ordinary torts but also from such actions for State constitutional torts."   *Id.* (quoting *Chin*, 241 F. Supp. 2d at 548).

"Unless the Maryland General Assembly has waived State sovereign immunity, the doctrine bars an individual plaintiff from maintaining a suit for money damages against the State of Maryland or one of its agencies for violations of State law."   *Id.* at 22.   "The sole waiver of immunity provision in the [Local Government Tort Claims Act] is the waiver of the 'governmental or sovereign immunity to avoid the duty to defend or indemnify an employee."   *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 323 (2001).

State sovereign immunity is applicable to state agencies and instrumentalities.   *Corbitt*, 2021 U.S. Dist. LEXIS 149996, at *21.   "Maryland law defines the BPD as a State agency."   *Id.* at *22.   It is well-established that "BPD 'enjoys sovereign immunity from actions for damages

based on state common law torts or state constitutional torts.'" *Bumgardner v. Taylor*, No. RDB-18-1438, 2019 U.S. Dist. LEXIS 53759, at *16-17 (D. Md. Mar. 28, 2019) (citing *Chin*, 241 F. Supp. 2d at 547-48)).  Accordingly, the BPD Motion as to Count II against BPD will be granted.

### B.  Officers in their Official Capacities

Webb and Roepcke assert that they are protected by state sovereign immunity to the extent Plaintiff asserts a claim against them in their official capacities.  (ECF No. 40-1, p. 13; ECF No. 41-1, p. 17.)

"[A] claim against a state official in his official capacity is analogous to asserting a claim against the entity of which the official is an agent."  *Griffin v. Salisbury Police Dep't*, No. RDB-20-2511, 2020 U.S. Dist. LEXIS 192746, at *10 (D. Md. Oct. 19, 2020).  Accordingly, a suit against a BPD officer in his official capacity is essentially a suit against BPD.  *Corbitt*, 2021 U.S. Dist. LEXIS 149996, at *22.  An individual officer is therefore entitled to state sovereign immunity when sued in his official capacity.  *Id.*  Accordingly, the BPD Motion and Roepcke's Motion as to Count II against Webb and Roepcke in their official capacities will be granted.

### C.  Officers in their Individual Capacities

In Count II, Plaintiff also states a claim against Webb and Roepcke in their individual capacities under the Maryland Declaration of Rights, Article 40.  (ECF No. 39 ¶ 65.)  Count II states the same free speech retaliation claim set forth in Count I; the only difference is Count II is brought under the state constitution.

Maryland state constitutional claims are subject to the Local Government Tort Claims Act ("LGTCA").  *Crystal v. Batts*, No. JKB-14-3989, 2015 U.S. Dist. LEXIS 129825, at *27 (D. Md. Sept. 25, 2015); *see Rounds v. Md.-Nat'l Capital Park, Planning Comm'n*, 441 Md. 621, 644 (2015) (concluding that "the [LGTCA] notice requirement ordinarily applies to state constitutional

claims for damages").  Under the LGTCA, Plaintiff has 180 days from an alleged instance of retaliation to give notice of the claim to the offending local government or its employees.  MD. CODE ANN., CTS. & JUD. PROC. § 5-304(b)(1) (LexisNexis 2022).

### i.   LGTCA Notice[11]

Roepcke argues that Plaintiff's LGTCA notice makes no reference to the July or August 2019 complaint.  (ECF No. 41-1, p. 17.)  Plaintiff counters that LGTCA notice need not state every instance or fact on which the notice relies; instead, the notice must only demonstrate that Plaintiff was subject to retaliatory action based on his role in the OIG investigation and Roepcke's application to HDS.  (ECF No. 44-1, pp. 24-25.)

The LGTCA requires that notice to be in writing and state the time, place, and cause of the claimed injury.  § 5-304(b)(2).  In *Dehn Motor Sales, LLC v. Shultz*, the Maryland Court of Special Appeals explained that, although the notice required by the LGTCA is a condition precedent to maintaining an action, strict compliance is not required.  212 Md. App. 374, 386 (2013).  "The purpose of the notice requirement . . . is to apprise a municipality 'of its possible liability at a time when it could conduct its own investigation, *i.e.*, while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it.'"  *Id.* (quoting *Moore v. Norouzi*, 371 Md. 154, 168 (2002)).

Plaintiff's 10-page LGTCA notice provides details regarding the alleged retaliation by Roepcke. (ECF No. 1-1; ECF No. 39 ¶¶ 16, 17.)  The notice states:

---

[11] The LGTCA notice (ECF No. 1-1) is not attached to the Amended Complaint.  The court may consider "exhibits attached to the original complaint that are 'integral and explicitly relied on in the [amended] complaint,' and whose authenticity is not challenged.'"  *Jeffrey M. Brown Assocs. v. Rockville Ctr., Inc.*, 7 Fed. Appx. 197, 202 (4th Cir. 2001) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).  *See generally* Consideration of Exhibits section, *supra,* at pp. 8-9.  The LGTCA notice is integral to the Amended Complaint, because Plaintiff's entitlement to pursue Count II arises, in part, from his compliance with the LGTCA.  Further, Plaintiff relies upon the notice in his Amended Complaint, and Defendants do not challenge its authenticity.  Therefore, the court considers it.

At the time Sgt. Roepcke was engaging in his wrongful and harassing acts against Officer Mealey, he was aware of that Officer Mealey had provided information to Sgt. Adamek. Sgt. Roepcke was also aware that Officer Mealey had worked with and provided information to the OIG regarding their investigation into his actions during the Danger Zone operation and other matters of fraud, waste, and abuse.  Sgt. Roepcke's acts are retaliatory and in direct violation of Officer's Mealey's First Amendment rights, as well as the BPD's Whistleblower Protection Policy No. 1792.

(ECF No. 1-1.)  The notice indicates that the complained-of actions began in February 2019 and were ongoing until July 2021.  *Id.*  The notice further describes Roepcke's acts as retaliatory in nature and in direct violation of Plaintiff's First Amendment rights.  *Id.*  Accordingly, the court finds that Plaintiff's LGTCA notice fulfilled the purpose of the notice requirement.  Dismissal of Count II is not appropriate on this ground.

*ii.*  **Maryland Declaration of Rights Article 40 (Count II)**

"The [c]ourt's analysis is generally the same as to both federal and Maryland state free speech retaliation claims."  *Crystal v. Batts*, No. JKB-14-3989, 2015 U.S. Dist. LEXIS 129825, at *28 (D. Md. Sept. 25, 2015); *see also Wallace v. Moyer*, No. CCB-17-3718, 2020 U.S. Dist. LEXIS 55093, at *27 (D. Md. Mar. 30, 2020) (instructing that "Article 40 is read in *pari materia* with the First Amendment").  Accordingly, for the reasons stated in Section I.B., the court will deny the BPD Motion and Roepcke's Motion as to Count II against Webb and Roepcke in their individual capacities.

## CONCLUSION

For the reasons set forth herein, the BPD Motion to Dismiss will be granted in part and denied in part as follows: granted as to Counts I and II against Defendant Webb in his official capacity; granted as to Count II against BPD; and denied as to Counts I and II against Webb in his individual capacity.  Roepcke's Motion will be granted in part and denied in part as follows: granted as to Counts I and II against Roepcke in his official capacity; and denied as to Counts I

and II against Roepcke in his individual capacity.  Accordingly, the case shall proceed on Count I

against BPD, Webb in his individual capacity and Roepcke in his individual capacity; and on Count

II against Webb and Roepcke in their individual capacities.

A separate order follows.

_____/S/_____
Julie R. Rubin
United States District Judge

February 15, 2023